UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ROY CONTEH , VICTOR SASAY a/k/a Victor Sesay, and TAPSIRU DAINKEH,<br><br>Defendants. | 5:15-CR-50101-JLV<br><br>REPORT AND RECOMMENDATION |

Pending are Defendants' Motions to Suppress (Doc. 97, 103, 105).  A hearing was held on Monday, March 7, 2016.  Roy Conteh, Victor Sesay, and Tapsiru Dainkeh were personally present and represented by their attorneys of record, Shiloh MacNally, John Rusch, and Jamy Patterson, respectively.  The Government was represented by Megan Poppen.  Six witnesses testified at the hearing.  Forty exhibits were received into evidence.  Both parties have submitted briefs and oral argument was heard at the conclusion of the hearing.  Based on careful consideration of all the evidence, and counsels' written and oral arguments, the Court respectfully recommends that the motions to suppress be granted in part and denied in part.

## **JURISDICTION**

Defendants were initially charged in an Indictment with Aggravated Identity Theft, in violation of 18 U.S.C. §§ 1028A(a)(1) and 2 and Possession of Unauthorized Access Device, in violation of 18 U.S.C. §§ 1029(a)(3) and 2.

1

Subsequent to the evidentiary hearing, Defendants were charged in a Superseding Indictment with Conspiracy to Commit Bank Fraud, in violation of 18 U.S.C. §§ 1349 and 1344; Bank Fraud, in violation of 18 U.S.C. §§ 1344(2) and 2; Aggravated Identity Theft, in violation of 18 U.S.C. §§ 1028A(a)(1) and 2; and Possession of Unauthorized Access Device, in violation of 18 U.S.C. §§ 1029(a)(1) and 2.

The pending Motions were referred to this Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Chief Judge Jeffrey L. Viken's Standing Order dated March 9, 2015.

## FACTUAL BACKGROUND

On July 10, 2015, at approximately 12:18 p.m., Trooper Zac Bader was in his patrol car in the median on Interstate 90 near mile marker 66 facing west-bound.  He saw a vehicle that appeared to be driving above the posted speed limit.  He activated his radar, which allegedly measured the vehicle driving 69 miles per hour in a 65 mile per hour zone.  He recognized this car as a Colorado rental car that, at the time, appeared to be driven by a single black male.  Trooper Bader testified that he observed the car following too close to another vehicle, but was unable to gauge the distance quickly enough.  He initiated a traffic stop at about mile 69 on Interstate 90.

Trooper Bader testified that his radar measured the correct speed of the correct vehicle.  He testified that if he doubted that it was the defendants' car speeding, he would not have made the traffic stop.  Victor Sesay testified that he used a GPS device that told him the speed limit while he was driving.  He

2

testified that the device has the ability to flash on the left hand side of the device if he travels above the speed limit. He testified that he was not traveling above the speed limit and the device was not flashing. Mr. Sesay also testified that there were other vehicles traveling faster than he was. Trooper Bader testified that there were vehicles traveling in front of the car the defendants were traveling in, but it was not those vehicles' speeds that he captured.

Mr. Sesay testified that Trooper Bader followed the defendants' car for some time before initiating the traffic stop. Trooper Bader testified that he initiated the traffic stop immediately. The command log shows that Trooper Bader initiated the traffic stop at 12:18 p.m. (Exhibit B). A vehicle registration query (Exhibit 2) for the license plate of the defendant's vehicle was run through the National Crime Information Center ("NCIC") database at 13:14:44. That time is believed by the defense to be 1:14 p.m. Central Time, or 12:14 p.m. Mountain Time.[1] The vehicle registration query was also run through the South Dakota database. (Exhibit 2). The time stamp is 12:16 p.m. (Exhibit 2). Trooper Bader testified that he thought the time might be off by a few minutes, because he did not remember running the plates before stopping the car. But, he testified it is possible that he ran the plates while following the car.

After stopping the defendants' car, Trooper Bader approached the vehicle from the passenger's side. When he approached, he saw, in the rear-cargo area of the vehicle, "nicer high end luggage" and "newer gift bags", which indicated

---

[1] Trooper Bader testified earlier that a one hour time disparity may be present because of Central Time and Mountain Time.

recent purchases.  He observed three black males inside the car.  He described the vehicles' occupants as "wearing nicer clothing, jewelry, accessories if you will as far as kind of high end watches and stuff like that as far as the clothing goes."  Trooper Bader also testified that there was a center console (not in reference to the cup holders) where he saw an "unusual amount of gift cards or pre-paid debit type cards."  He "knew it was enough to kind of make [him] look at it and take note of it."[2]  He estimated the amount of the cards to be more than five but fewer than ten or twelve.[3]  Mr. Sesay testified that they did not have debit or gift cards sitting out and visible to Trooper Bader.

Trooper Bader thought all three defendants appeared to be nervous and uneasy with his presence, but testified that this was common for an initial traffic stop.  He asked the driver, Victor Sesay, for his driver's license and rental contract information.  Victor Sesay handed Trooper Bader his driver's license.  The rental contract was provided by Tapsiru Dainkeh, the front passenger.  Mr. Dainkeh identified himself as the renter of the vehicle.

Trooper Bader had Mr. Sesay come back to the patrol vehicle with him, which is his usual protocol.  Mr. Sesay sat in the front, passenger seat in Trooper Bader's vehicle.  Trooper Bader testified that Mr. Sesay appeared overly nervous and was rubbing his hands on top of his legs like he was trying to get sweat off of his hands.  Mr. Sesay seemed uncomfortable, but was friendly

---

[2] Despite this comment, Trooper Bader failed to note these cards in his report or take a picture of where he allegedly saw them.

[3] This testimony changed during the hearing. At other times, Trooper Bader estimated the number of cards to be over five and potentially even more than ten.

while in the car.  Trooper Bader testified that it is typical for someone to be nervous when they come to his patrol vehicle, but Mr. Sesay's nervousness increased throughout the traffic stop.  Trooper Bader testified that Mr. Sesay spent time looking at his phone and trying to hide what he was doing on his phone in between his legs.  The two discussed the reason for the stop and engaged in general conversation such as where the defendants were going, where they were coming from, and the reason for their trip.  While this was going on, Trooper Bader ran a driver's license query (Exhibit 3), which checked the status of Mr. Sesay's license.  Mr. Sesay had a valid driver's license out of Maryland.  Exhibit 3 shows that the license query on Mr. Sesay was done through NCIC at 13:23:23, which would have been 12:23 p.m. Mountain Time. Trooper Bader testified that this time was correct.  Exhibit 3 also shows the time stamp for the query run through the South Dakota database as 12:26 p.m. Mountain Time.

It was about this time that Trooper Bader informed Mr. Sesay he would merely be receiving a warning ticket.  The warning ticket[4] is time stamped 12:28 p.m. Trooper Bader testified that this is when the warning ticket was "opened."  Trooper Bader initiated the process to auto-populate the information received from the query into a citation.  While a citation populates, Trooper Bader said he likes to engage in conversation with the individual in his car to "bypass time and help their outlook on law enforcement, if you will."

---

[4] Neither party moved for admission of the warning ticket into evidence.

5

Trooper Bader questioned Mr. Sesay about travel details.  He asked where the defendants were coming from.  Mr. Sesay responded that they were coming from Wyoming and were heading back to Denver, Colorado that day for a wedding.  Trooper Bader testified this indicated that the defendants were currently off route[5] and he asked Mr. Sesay how they got to Denver.  Mr. Sesay responded that the three had flown to Denver and traveled to Wyoming. Trooper Bader said the responses were very vague, lacked details on where the wedding was located, who was getting married, to whom the person was marrying, how long Mr. Sesay had known the person, and when the wedding was supposed to take place.  Trooper Bader testified that Mr. Sesay conveyed a generic story and timeline.  Based on his training and experience, Trooper Bader said these responses indicated Mr. Sesay was lying about the trip and it raised suspicion of criminal activity.  As Mr. Sesay was answering these questions, he appeared to be breathing heavily, wiping his hands, continuously looking at his phone, and trying to come up with answers for simple questions.

Trooper Bader testified that he expected responses from Mr. Sesay because "people are, for the most part, friendly and they will engage in conversation with you."  He went on to testify that he did not think it was reasonable for a person to try and continue about his business and not engage in friendly conversation.  He could only think of a couple of times when someone has taken that approach.

---

[5] Mr. Sesay testified that they missed the exit a few miles earlier and were going to turn around at the next interstate exchange exit.

Trooper Bader next questioned Mr. Sesay about consent to search and the items in the vehicle.[6]  Trooper Bader asked Mr. Sesay if there was anything illegal inside of the vehicle and if he would consent to search of the car and his property.  According to Trooper Bader, Mr. Sesay did not object to the search.

Trooper Bader then approached Mr. Dainkeh and Mr. Conteh and asked about the reason for the trip and consent to search.  According to Trooper Bader, they were nervous and uncomfortable talking about the trip.  According to Trooper Bader, they provided details about the trip that were inconsistent with Mr. Sesay's details.  For example, Mr. Dainkeh mentioned they were driving to Sioux Falls before going to Denver, but Mr. Sesay had not mentioned Sioux Falls.

The questioning regarding the trip itinerary of Mr. Sesay, Mr. Dainkeh and Mr. Conteh occurred between 12:28 p.m., when the warning ticket was opened, until approximately 12:49 p.m. (Exhibit B), when Trooper Bader requested backup.  Therefore, 21 minutes elapsed between when Trooper Bader decided to issue a warning ticket and when he called for backup, presumably to assist with the search.

Mr. Sesay testified that he did not consent to the search.  According to Trooper Bader, both Mr. Dainkeh and Mr. Conteh gave consent to search the vehicle.  When Trooper Bader returned to Mr. Sesay with this information, he testified and detailed in his report (Exhibit 1) that Mr. Sesay was surprised

---

[6] This first request for consent was not in Trooper Bader's report.

they would allow him to search the vehicle.[7]  Trooper Bader testified that Mr. Sesay still consented to the search of his property.

Trooper Bader testified that during the stop, the defendants never withdrew consent and he never told them they could withdraw consent. Contrary to his previous testimony, Trooper Bader testified that the defendants were consistently friendly throughout the stop.  There was joking throughout and they were smiling and happy.  At the end of the stop when property was seized from them, they did not come off as concerned about the seized property.

Trooper Bader searched the vehicle.  He testified that he does not immediately take pictures when he searches a vehicle, so some items had been moved prior to taking pictures.  Trooper Bader testified, "[s]o once I became suspicious of criminal activity and knew that we were going down the road of where we wanted to preserve some evidence and stuff, I went back and tried to take some photos to give a good note of where items were located."

Trooper Bader testified that he issued the defendants a warning ticket once he concluded the search at approximately 3:09:05.  Mr. Sesay testified that he never received a warning ticket.

---

[7] This lends credibility to Mr. Sesay's testimony.  If indeed, Mr. Sesay previously consented to the search as claimed by Trooper Bader, it is illogical that he would act surprised when informed that his companions also consented to the search.

**DISCUSSION**

I.   **Trooper Bader Had Probable Cause to Stop the Defendants' Vehicle**

The Defendants argue that Trooper Bader lacked probable cause or reasonable suspicion to stop the vehicle in which the Defendants were traveling.  (Doc. 97 at p.1; Doc. 104 at p. 2; Doc. 105 at p. 1).  Mr. Sesay denies the Defendants were traveling above the posted speed limit.  The United States argues that Trooper Bader had probable cause to stop the vehicle because the radar detected Defendants traveling 69 miles per hour in a 65 mile per hour zone.  (Doc. 101 at p. 4).

The stop of an automobile is reasonable "where the police have probable cause to believe that a traffic violation has occurred." United States v. Adler, 590 F.3d 581, 583 (8th Cir. 2009) (citing Whren v. United States, 517 U.S. 806, 810 (1996)).  This is true "however minor" the traffic violation.  The officer's subjective motivations are irrelevant to the determination of probable cause. United States v. Sepulveda-Sandoval, 729 F.Supp.2d 1078, 1091 (D.S.D. 2010) (citing United States v. Sallis, 507 F.3d 646, 649 (8th Cir. 2007)).  "So long as the officer is doing nothing more than he is legally permitted and objectively authorized to do, his actual state of mind is irrelevant for purposes of determining [the] stop's lawfulness." United States v. Herrera Martinez, 354 F.3d 932, 934 (8th Cir. 2004) (judgment vacated on other grounds) (citing United States v. Pereira-Munoz, 59 F.3d 788, 791 (8th Cir. 1995)).  The burden rests on the government to show that probable cause existed for the stop. United States v. Andrews, 454 F.3d 919, 922 (8th Cir. 2006).

9

There are two types of errors a police officer might make when effecting a traffic stop:  a mistake of fact and a mistake of law.  As to the former, as long as the mistake of fact is objectively reasonable under the circumstances and the officer proceeded in good faith, the mistake will not doom the legality of the traffic stop.  United States v. Payne, 534 F.3d 948, 951 (8th Cir. 2008) (officer conducted a traffic stop based on the objectively reasonable mistaken factual belief that the vehicle lacked a front license plate, which was in violation of the law).

"A violation of any maximum speed limit established by [The Transportation Commission] is a violation of S.D.C.L. 32-25-7[8]."  The court finds that Trooper Bader had probable cause to stop the vehicle despite any alleged pretext.   While not necessarily finding Mr. Sesay's testimony unreliable, the court finds that Trooper Bader, at most, had an objectively reasonable mistaken factual belief that the defendants were traveling above the speed limit.  Thus, the traffic stop was lawful.

---

[8] 32-25-7.   Establishment of speed zones--Posting of zones--State or federal roads--Violation as misdemeanor. The Transportation Commission may establish, by rules promulgated pursuant to chapter 1-26, a maximum speed limit of less than that established by §§ 32-25-1.1 and 32-25-4 upon any highway or portion of highway under the jurisdiction of the Department of Transportation, and any portion of highway under the jurisdiction of a state or federal agency if requested by the agency. The speed limit established by the commission is the maximum speed that any person may drive or operate any vehicle or class of vehicle upon that portion of highway. The Department of Transportation shall conspicuously post signs at the beginning and end of a portion of highway to show the maximum speed limit established by the commission on that portion of highway. A violation of any maximum speed limit established by the commission pursuant to this section is a Class 2 misdemeanor.

32-25-4 Maximum speed on interstate highways--Violation as misdemeanor. Except as provided pursuant to § 32-25-7, no person may drive a vehicle upon the national system of interstate highways at a speed in excess of eighty miles per hour. A violation of this section is a Class 2 misdemeanor.

10

## II.    Trooper Bader Impermissibly Expanded the Stop and Detention

The Defendants also claim they were detained unlawfully because Trooper Bader unreasonably extended the stop by his questioning of the Defendants and search of the vehicle.  (Doc. 90 at p. 1; Doc. 103 at p. 2).  The United States argues that Trooper Bader had probable cause to search the vehicle because he had reasonable suspicion to believe "criminal activity was afoot" after speaking with Mr. Sesay.  (Doc. 101 at p. 6).  The Government argues that after speaking with Mr. Conteh and Mr. Dainkeh, Trooper Bader had probable cause to search the rental vehicle.  (Doc. 101 at p. 7).  Having already determined that the stop was lawful, the court now examines whether Trooper Bader unlawfully extended the stop by continued questioning.

"Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a seizure of persons within the meaning of the Fourth Amendment."  Whren, 517 U.S. at 810 (internal quotations omitted) (other citations omitted).  The stop must not be "unreasonable under the circumstances."  Id.  Generally, "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."  Id. (other citations omitted).

A stop may last no longer than "is necessary to effectuate" the purpose of the stop.  Rodriguez v. United States, 135 S. Ct. 1609, 1614 (2015).  "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed."  Id. (other citations omitted).  "An

officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop . . . but . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." Id. at 1615.

A stop may be extended if reasonable suspicion of criminal activities justifies detaining an individual beyond the purpose of the stop.  See Id.; United States v. Ward, 484 F.3d 1059, 1062 (8th Cir. 2007) (if an officer asks reasonably related questions and those raise a trooper's suspicions, the trooper may "expand the scope of the stop to ask additional, more intrusive, questions"); United States v. Gomez Serena, 368 F.3d 1037, 1040 (8th Cir. 2004) (if the officer's observations arouse reasonable suspicions, the officer is entitled to "expand the scope of the stop and ask questions not directly related to the initial traffic stop"). Reasonable suspicion is based on the totality of the circumstances and "in the light of the officer's experience."  United States v. Pereira-Munoz, 59 F.3d 788, 791 (8th Cir. 1995) (internal quotations omitted) (other citations omitted).

"If the investigatory stop is not supported by reasonable suspicion or if the officers exceed the proper scope of the stop, then any evidence derived from the stop must be excluded from trial."  United States v. Seupulveda-Sandoval, 729 F.Supp.2d 1078, 1092 (D.S.D. 2010) (citing Wong Sun v. United States, 371 U.S. 471 (1983).  In other words, a traffic stop can become unlawful "if it is prolonged beyond the time reasonably required to complete its purpose."

12

United States v. Peralez, 526 F.3d 1115, 1119 (8th Cir. 2008) (internal quotations omitted) (citing Illinois v. Caballes, 543 U.S. 405, 407 (2005)).

Permissible inquiries that are related to the purpose of the stop include "checking the driver's license and registration, asking the driver to step out of the vehicle, asking the driver to sit in the patrol car, and requesting the driver's destination and purpose." Gomez Serena, 368 F.3d at 1040 (other citations omitted). As part of a reasonable investigation, "an officer may also question a vehicle's passengers to verify information provided by the driver." Ward, 484 F.3d at 1061.

In Peralez, the Eighth Circuit found that a Trooper who conducted a traffic stop and determined after three minutes that the driver should receive a warning ticket violated the Fourth Amendment when he extended the stop to ask drug interdiction questions. 526 F.3d at 1120. The Trooper "blended" routine processing with drug interdiction questions, thus delaying the stop. Id. The extension was not consensual and the officer did not have reasonable suspicion when he began asking drug interdiction questions. Id. (a stop may be extended on one of two grounds: consent or reasonable suspicion). "The stop was delayed because of the trooper's drug interdiction questioning, not because of anything related to the investigation or processing of the traffic violation." Id. When the Trooper went to speak with the passenger of the vehicle, he had completed about half of the warning ticket. Id. at 1118.

Similarly, Trooper Bader unlawfully prolonged the traffic stop to question the Defendants about their activities and potential illegal activity. Trooper

13

Bader pulled over the vehicle at 12:18 p.m. (Exhibit B).  He asked Mr. Sesay to sit in the patrol car and ran a license query on Mr. Sesay at either 12:23 p.m. (the time from the NCIC database) or 12:26 p.m. (the time from the South Dakota database) (Exhibit 3).  Trooper Bader testified it was at that time he decided to issue a warning ticket.  The ticket showed a time of 12:28 p.m. and Trooper Bader testified that is the time he started the ticket.  The purpose of the stop was then complete.  Trooper Bader prolonged it by, not only asking Mr. Sesay questions about the defendants' itinerary, but also whether there was anything illegal inside of the vehicle.  He continued to impermissibly extend the stop by questioning Mr. Sesay, Mr. Conteh, and Mr. Dainkeh.

The United States argues that Trooper Bader was 1) permitted to question the defendants regarding their travel plans and 2) had reasonable suspicion to extend the stop.  (Doc. 101 at p. 5-6).  Trooper Bader testified that he had reasonable suspicion to extend the stop based on the high end clothing, the cards in the center console, the inconsistent answers from the defendants about their itinerary, the direction of travel and the nervousness of the defendants.  The court finds these circumstances do not amount to reasonable suspicion.

The court finds Trooper Bader's testimony on these issues to be contradictory and therefore, not fully credible.  He claims Mr. Sesay was unduly nervous, but also testified that the mood throughout the stop was friendly, cooperative and joking.   He claimed that the alleged cards in the center console were significant enough to raise his suspicion, but he did not

14

find them significant enough to include in his report or photograph.  His testimony regarding the amount of cards he viewed changed throughout the hearing.  He thought criminal activity was afoot, but he could not seem to articulate what he suspected the defendants were doing wrong until he searched their belongings.  Trooper Bader testified that it was only after he began searching that he took pictures of the property in the vehicle because it was at that point he became suspicious of criminal activity and the potential need to seize property as evidence.

At the time Trooper Bader decided to issue a warning ticket and extended the stop, all he knew was the Defendants had high end clothing and jewelry in the vehicle and Mr. Sesay was nervous when he joined Trooper Bader in his vehicle.[9]  "Generally . . . nervousness is of limited significance in determining reasonable suspicion." United States v. Jones, 269 F.3d 919, 928-29 (8th Cir. 2001) (internal quotations omitted) (other citations omitted).  Excessive nervousness "in conjunction with only one or two other facts can generate reasonable suspicion that criminal activity is afoot." Id. at 928.  Despite the claim of excessive nervousness, there were no other factors at the time Trooper Bader extended the stop to find objective reasonable suspicion.  Thus, he had no reasonable suspicion to extend the traffic stop beyond what was necessary to effectuate the purpose of the stop and the extension was in violation of the Fourth Amendment.  This extension violated the Fourth Amendment rights of all three Defendants.  See United States v. Green, 275 F.3d 694, 699 (8th Cir.

---

[9] He testified it is normal for someone to be nervous initially.

2001) (a passenger of a vehicle may challenge his unlawful detention resulting from a stop of the driver and vehicle) (citing United States v. Kreisel, 210 F.3d 868, 869 (8th Cir. 2000)).

### III.   Whether the Vehicle was Lawfully Searched

The Defendants claim that Trooper Bader did not have consent or probable cause to search the vehicle.  The United States claims that Trooper Bader had probable cause to search.  In the alternative, the United States argues that Trooper Bader received consent from all parties to search the vehicle.

### A. Trooper Bader did not Have Probable Cause to Search the Vehicle

The Government argues that Trooper Bader had probable cause to search the vehicle because he had reasonable suspicion to extend the stop based on Mr. Sesay's behavior and responses, coupled with inconsistent responses about the defendants' itinerary from Mr. Conteh and Mr. Dainkeh. (Doc. 101 at p. 6-7).

Searches must generally be conducted "pursuant to a warrant issued by an independent judicial officer." United States v. Caves, 890 F.2d 87, 89 (8th Cir. 1989) (citing California v. Carney, 471 U.S. 386, 390 (1985)).  Outside of this process, searches are "per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." United States v. Vore, 743 F.3d 1175, 1178 (8th Cir. 2014) (citing Katz v. United States, 389 U.S. 347, 357 (1967)).

16

One such exception to the warrant requirement is the "automobile exception, which allows a police officer who has lawfully made a roadside stop of an automobile to search that vehicle without a warrant if probable cause exists to believe that contraband or evidence of criminal activity is located inside." Caves, 890 F.2d at 89 (internal quotations omitted) (citing e.g. Carroll v. United States, 267 U.S. 132 (1925)).

Probable cause exists where "in the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Vore, 743 F.3d at 1178 (internal quotations omitted) (citing United States v. Kennedy, 427 F.3d 1136, 1141 (8th Cir. 2005)).

In United States v. Jones, officers had probable cause to conduct a search of an automobile. After stopping the defendant for making an illegal turn and driving without a state license plate, the officers saw the defendant tearing a blue piece of paper into a number of pieces and pushing them between the seats of his car. 452 F.2d 884, 889 (8th Cir. 1971). The defendant's physical appearance did not match the license he had given the officers and he was unable to correctly answer questions referencing the license. The defendant was placed under arrest for the illegal turn and driving without a state license plate. The officers returned to the vehicle and saw three scraps of the blue paper in plain view. The officers searched the seats for the rest of the paper and discovered the paper was a stolen welfare check.

In United States v. Caves, the court found that "the odor of an illegal drug can be highly probative in establishing probable cause for a search." 890

17

F.2d 87, 90 (8th Cir 1989).  The defendant was stopped for speeding and the Trooper requested that the defendant join him in the squad car.  While in the squad car discussing the violation, the trooper smelled burnt marijuana on the defendant's person and breath.  The smell, combined with the fact that the defendant emerged from a vehicle driven several hundred miles, the late hour, and the stop on the interstate, the trooper had probable cause to conclude that the defendant had smoked marijuana in the vehicle.  The trooper therefore had probable cause to search the vehicle.

Trooper Bader did not have probable cause to search the vehicle.  This case is unlike Caves and Jones, where law enforcement smelled marijuana or witnessed the destruction of an item which led them to conclude that evidence of a crime would be found in a car.  Trooper Bader learned the Defendants were driving a long distance, Mr. Sesay was allegedly nervous, and Mr. Sesay's itinerary did not necessarily match that of Mr. Conteh or Mr. Dainkeh. The court also did not find Trooper Bader's testimony—that debit or credit cards were in the center console—completely credible.  Even if there were 5-12 cards located in the center console, this fact is not incriminating.  This information was not enough to provide a fair probability that evidence of criminal activity would be found in the vehicle.

Moreover, Trooper Bader testified that if the Defendants did not give him consent to search the vehicle, then he could have walked a drug dog around the vehicle.  A stated need to bring out a drug dog to hopefully alert to a basis on which to search the vehicle further demonstrates Trooper Bader's lack of

18

probable cause.  This statement also shows that Trooper Bader himself did not believe he had probable cause despite the alleged presence of several credit or debit cards in the center console, alleged nervousness by Mr. Sesay and inconsistent travel itineraries by the passengers.

### B. The Defendants did not Consent to a Search of the Vehicle

Having already determined that the stop was impermissibly extended, the Government may not merely demonstrate the defendants consented to the search.  "A voluntary consent to search, which was preceded by an illegal police action, does not automatically purge the taint of an illegal detention." United States v. Barnum, 564 F.3d 964, 971 (8th Cir. 2009) (internal quotations omitted) (citing United States v. Esquivel, 507 F.3d 1154, 1160 (8th Cir. 2007)).  "To purge the taint, the voluntary consent must be an independent, lawful cause of the search, as determined by . . . (1) the temporal proximity between the Fourth Amendment violation and the grant of consent to search; (2) the presence of any intervening circumstances; and (3) the purpose and flagrancy of the officer's Fourth Amendment violation."  Id. (citing Brown v. Illinois, 422 U.S. 590, 603-04 (1975).  The government must show "by a preponderance of the evidence that the defendant's consent to search was voluntary and that the defendant's consent was an act of free will sufficient to purge the taint of the Fourth Amendment violation."  Barnum, 564 F.3d at 969 (citing Esquivel, 507 F.3d at 1160)).

The court received conflicting testimony on the issue of consent.  Trooper Bader testified that all three Defendants consented to the search.  Mr. Sesay

and Mr. Dainkeh both testified that they did not give consent to search.  The court does not have an independent way to resolve this conflict because the video of the stop was either improperly categorized or not tagged and was deleted after a certain number of days as part of a routine system of data management.  The preservation of this evidence would have been helpful to the court in resolving this issue.  Assuming, without deciding, that consent was given, the court will now analyze whether the consent was voluntary.

In reviewing the temporal proximity between the violation and the consent, "the closer this period, the more likely the defendant's consent was influenced by, or [was] the product of, the police misconduct." Barnum, 564 F.3d at 972 (internal quotations omitted) (citing United States v. Simpson, 439 F.3d 490, 495 n.3 (8th Cir. 2006)).  An affirmation that consent was previously given, does not "aid in determining whether the original consent was an independent act of free will." United States v. Herrera-Gonzalez, 474 F.3d 1105, 1111-12 (8th Cir. 2007); But see United States v. Moreno, 280 F.3d 898 (8th Cir. 2002) (even though the initial stop of defendant violated the Fourth Amendment, the defendant consented to a search initially, consented again to a continued search and never objected to a search after vehicle was towed).

In Barnum, the driver gave consent to search his vehicle 10-15 minutes after the illegal traffic stop.  The Eighth Circuit found this amount of time favored the government.  564 F.3d 972.  A similar conclusion was reached in Herrera-Gonzalez, where the court did not find a 10-15 minute period insufficient to purge the taint of the illegal stop.  474 F.3d at 1112.

20

In this case, there was effectively no break between the illegal extension and the request for consent.  Trooper Bader decided he would issue a warning ticket.  After making his decision to issue a warning ticket, Trooper Bader testified that he began asking questions related to itinerary, whether there was anything illegal in the car, and whether he could search.  Where the stop and investigation should have ended, the prolonged stop began.  Thus, the first factor favors the Defendants.

As to the presence of intervening circumstances, "an intervening circumstance between the Fourth Amendment violation and the defendant's consent indicates that the consent was made of the defendant's free will and that 'the officer was not attempting to exploit an illegal situation.'"  Barnum, 564 F.3d at 972 (citing United States v. Grajeda, 497 F.3d 879, 882 (8th Cir. 2007).  Such an intervening circumstance was found in Barnum where the defendant was given his paperwork back and told the stop was over before the officer asked search the defendant's person and vehicle.  564 F.3d at 972-73.

In the present case, the second factor favors the Defendants because there is no evidence of an intervening circumstance.  Again, there was no break between the illegal extension and request for consent.  While Mr. Sesay was told he would be receiving a warning ticket, he was not told he was free to go and Trooper Bader exited his patrol car to question the passengers.  There is also no evidence that the passengers were told a warning ticket was being issued.

Finally, with respect to the purpose and flagrancy of the violation, "a police officer's purposeful or flagrant misconduct may demonstrate a causal connection between the violation and the consent." <u>Barnum</u>, 564 F.3d at p. 973 (citing <u>Brown</u>, 422 U.S. at 603-04).  "A Fourth Amendment violation may be purposeful or flagrant under various circumstances, including where the violation 'was investigatory in design and purpose and executed in the hope that something might turn up.'" <u>Barnum</u>, 564 F.3d at 973 (citing <u>United States v. Herrera-Gonzalez</u>, 474 F.3d 1105, 1113 (8th Cir. 2009)).  Additionally, purposeful and flagrant conduct has been found where "the impropriety of the official's misconduct was obvious or the official knew, at the time, that his conduct was likely unconstitutional but engaged in it nevertheless." <u>Herrera-Gonzalez</u>, 474 F.3d at 1113 (even an unreasonable mistake "alone is not sufficient to establish flagrant misconduct").

In <u>Herrera-Gonzalez</u>, the court did not find a traffic stop was obviously improper or flagrant where the officer conducted the stop based solely on the defendant crossing the fog line.  474 F.3d at 1113-14.  The officer stopped the defendant's vehicle out of concern that he was impaired or tired.  After pulling the vehicle over and calling in the license plates to dispatch, the license plates came back "not on file," which suggested that the plates could be invalid or there was no record of them.  The officer was objectively reasonable in stopping the vehicle and there were no facts in the record to suggest "that [the officer] had an investigatory purpose" before he learned the plates were not on file.  <u>Id.</u> at 1114.

22

Similarly, in Barnum, the officer initiated a traffic stop after allegedly observing that the vehicle's center tail light was malfunctioning.  564 F.3d at 973.  The court found that even if this observation was objectively unreasonable, such behavior is not "'the type of blatantly unconstitutional or flagrant behavior condemned in Brown.'"  Id. (other citations omitted).

The above two cases are in stark contrast to Brown where the United States Supreme Court found that Brown was subject to an illegal arrest and the detectives who arrested the defendant acknowledged the purpose of the arrest was investigatory.  Brown, 422 U.S. at 604.  The detectives broke into Brown's apartment, searched it and arrested Brown without probable cause or a warrant.  Id. at 593.  "The detectives embarked upon this expedition for evidence in the hopes that something might turn up.  The manner in which Brown's arrest was affected gives the appearance of having been calculated to cause surprise, fright and confusion."  Id. at 604-05.

Trooper Bader's extension of the traffic stop was not as egregious as law enforcement activities in Brown, but was not a mere mistake of fact as in Herrera-Gonzalez or Barnum.  The extension of the stop was purposeful.  Trooper Bader prolonged the stop in violation of Rodriguez and even planned to walk his drug dog around the vehicle if he did not receive consent.  These actions suggest an investigatory purpose to the Fourth Amendment violation.  Regardless, this third factor does not outweigh the harm done in the first two factors and the taint of the illegal detention was not purged so as to find the Defendants voluntarily consented to the search of their vehicle.

23

For all of the foregoing reasons, the court respectfully recommends the physical evidence seized from the car should be suppressed.

### C. Defendants Were not in Custody for the Purposes of Miranda

The Defendants also moved to suppress any custodial statements.  (Doc. 98 at p. 2; Doc. 103 at p. 2-3; Doc. 105 at p. 2).  It is unclear what statements were made and when.  The Defendants argue any and all statements made while they were in custody should be suppressed because they were not given Miranda warnings before being questioned.  The United States argues that the Defendants were not in custody or being interrogated because the Defendants were only asked routine, processing-type questions, which are not interrogation.  (Doc. 101 at p. 9; Doc. 107 at p. 17).

Miranda is triggered "only when a defendant is both in custody and being interrogated.  United States v. Head, 407 F.3d 925, 928 (8th Cir. 2005) (other citations omitted).  Even though the United States Supreme Court recognized that "a traffic stop of a car communicates to a reasonable passenger that he or she is not free to terminate the encounter with the police and move about at will," Arizona v. Johnson, 555 U.S. 323, 333 (2009), it has also held that "persons temporarily detained pursuant to [ordinary traffic stops] are not in custody for the purposes of Miranda."  Berkemer v. McCarty, 468 U.S. 420, 440 (1984).  "[T]he safeguards prescribed by Miranda become applicable as soon as a suspect's freedom of action is curtailed to a degree associated with formal arrest."  Berkemer, 468 U.S. at 440 (internal citations omitted) (other citations omitted).  If a motorist is detained pursuant to a traffic stop and finds

24

himself subjected to treatment that "renders him in custody for practical purposes, he will be entitled to the full panoply of protections prescribed by Miranda." Id.

In United States v. Sepulveda-Sandoval, the defendants were subject to a traffic stop and the trooper prolonged their detention in violation of the Fourth Amendment.  729 F.Supp.2d 1078 (D.S.D. 2010).  Once stopped, the trooper interrogated defendant Sepulveda-Sandoval without advising him of his rights under Miranda.  Id. at 1097.  A short time later, the trooper's drug detection dog alerted to the presence of narcotics and Sepulveda-Sandoval was handcuffed.  Id. at 1098.  No interrogation took place after Sepulveda-Sandoval was handcuffed.  Id.  The court reasoned that Sepulveda-Sandoval's statements should only be suppressed if the defendant was in custody.  Id. The court found that Sepulveda-Sandoval was not in custody to necessitate the reading of Miranda because, prior to handcuffs being placed on the defendant, the detention was the result of a mere traffic stop.  Id. at 1097-98.

The Defendants in the present case were detained as the result of an ordinary traffic stop.  No other form of restraint was imposed on them to suggest they were in custody for the purposes of Miranda.  Mr. Sesay testified that Trooper Bader handcuffed him, but the court does not find Mr. Sesay's testimony on this fact credible.  There is a lack of independent evidence showing that Trooper Bader handcuffed Mr. Sesay.  Plus, there is no allegation that Trooper Bader handcuffed either of the other two Defendants.  It would have been a curious decision for Trooper Bader to handcuff Mr. Sesay but not

25

Mr. Dainkeh or Mr. Conteh.  Thus, if any statements were made during the stop, they will not be suppressed because the defendants were not in custody for the purposes of <u>Miranda</u>.

## CONCLUSION

It is respectfully recommended that the defendants' motion to suppress physical evidence be granted and the defendants' motion to suppress statements be denied.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court.  *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990); *Nash v. Black*, 781 F.2d 665 (8th Cir. 1986).

DATED this 31st day of May, 2016.

BY THE COURT:

DANETA WOLLMANN
United States Magistrate Judge