UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br> vs.<br><br>ROY CONTEH,<br>VICTOR SASAY, a/k/a VICTOR SESAY<br>and TAPSIRU DAINKEH,<br><br>    Defendants. | CR. 15-50101-JLV<br><br>ORDER |

**INTRODUCTION**

  A grand jury issued an indictment charging defendants with ten counts of aggravated identity theft in violation of 18 U.S.C. §§ 1028A(a)(1) and 2, and one count of possession of an unauthorized access device in violation of 18 U.S.C. §§ 1029(a)(3) and 2. (Docket 1). Defendants filed separate motions to suppress physical evidence seized during the course of a traffic stop and any custodial statements made by the defendants during the stop. (Dockets 97, 103 & 105).

  The motions to suppress were referred to United States Magistrate Judge Daneta Wollmann pursuant to 28 U.S.C. § 636(b)(1)(B) and the standing order of March 9, 2015. An evidentiary hearing was held on March 7 and March 9, 2016. (Docket 109). Magistrate Judge Wollmann issued a report and recommendation ("R&R") on defendants' motions to suppress. (Docket 125). The magistrate judge recommended defendants' motions to suppress be granted in part and denied in part. Id. at p. 26. The government timely filed objections

to the report and recommendation. (Docket 156). The defendants filed responses to the government's objections. (Dockets 162, 164 & 169).

Under the Federal Magistrate Act, 28 U.S.C. § 636(b)(1), if a party files written objections to the magistrate judge's proposed findings and recommendations, the district court is required to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." Id. The court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." Id. See also Fed. R. Crim. P. 59(b)(3).

The court completed a *de novo* review of those portions of the R&R to which objections were filed. For the reasons stated below, the court finds the magistrate judge's report and recommendation is an appropriate application of the law to the facts presented by the parties at the suppression hearing. For the reasons stated below, the government's objections are overruled and the report and recommendation of the magistrate judge is adopted in its entirety.

## GOVERNMENT OBJECTIONS

The government objects to the R&R asserting the magistrate judge erred in making the following factual determinations:

1. [Q]uestioning regarding the trip itinerary of Mr. Sesay,[1] Mr. Dainkeh and Mr. Conteh occurred between 12:28 p.m., when the warning ticket was opened, until approximately 12:49 p.m. . . . when Trooper Bader requested backup. (Docket 156 ¶ 2) (quotation marks omitted).

---

[1]The court will spell Mr. Sesay's name as it appeared in the report and recommendation and exhibits from the suppression hearing.

2. [T]hat [Trooper Bader] thought criminal activity was afoot, but he could not seem to articulate what he suspected the defendants were doing wrong until he searched their belongings. Id. ¶ 6 (quotation marks omitted).

3. Trooper Bader testified that it was only after he began searching that he took pictures of the property in the vehicle because it was at that point he became suspicious of criminal activity and the potential need to seize property as evidence. Id. ¶ 7 (quotation marks omitted).

4. [D]espite the claim of excessive nervousness, there were no other factors at the time Trooper Bader extended the stop to find objective reasonable suspicion. Id. ¶ 8 (quotation marks omitted).

5. [T]he Court . . . did not find Trooper Bader's testimony—that debit or credit cards were in the center console—completely credible. Id. ¶ 9 (quotation marks omitted).

The government also objects to the R&R claiming the magistrate judge erred in reaching the following conclusions of law:

1. Trooper Bader, at most, had an objectively reasonable mistaken factual belief that the defendants were traveling above the speed limit. (Docket 156 ¶ 1) (quotation marks omitted).

2. Trooper Bader impermissibly expanded the stop and detention. Id. ¶ 3 (quotation marks and capitalization omitted).

3. [A]fter Trooper Bader advised Sesay that he was going to issue a warning ticket that the purpose of the stop was then complete. Id. ¶ 4 (quotation marks and brackets omitted).

4. [T[hat the following does not amount to reasonable suspicion: high end clothing the defendants wore, the cards in the center console, the inconsistent answers from the defendants about their itinerary, the direction of travel and the nervousness of the defendants. Id. ¶ 5 (quotation marks omitted).

3

5. Trooper Bader did not have probable cause to search the vehicle and . . . the Defendants did not consent to a search of the vehicle. Id. ¶ 10 (quotation marks, brackets and capitalization omitted).

6. [W]here the stop and investigation should have ended, the prolonged stop began. Thus, the first factor favors the Defendants. Id. ¶ 11 (quotation marks omitted).

7. [T]here was no break between the illegal extension and request for consent. Id. ¶ 12 (quotation marks omitted).

8. [T]he extension of the stop was purposeful. Trooper Bader prolonged the stop in violation of Rodriguez.[2] Id. ¶ 13 (quotation marks omitted).

Each government objection will be separately addressed in categories which make sense chronologically with the evidence presented at the suppression hearing.

**ANALYSIS**

PROBABLE CAUSE FOR STOP

On July 10, 2015, shortly after noon, South Dakota Highway Patrol Trooper Zac Bader was parked facing west-bound in the median of Interstate 90 near mile marker 66.[3] (Docket 125 at p. 2). At mile marker 66[4] the posted speed limit was 65 mph.[5]

---

[2]Rodriguez v. United States, 135 S. Ct. 1609 (2015).

[3]Mileposts along Interstate 90 in South Dakota begin with milepost 1 at one mile east of the Wyoming state border and increase each mile as the interstate proceeds east.

[4]"At approximately milepost 66 . . . there is a cross-over between the eastbound and westbound lanes of the interstate." United States v. Wamsley, CR. 14-50047 (D.S.D. 2014) (Docket 79 at p. 3).

[5]Effective May 27, 2014, the South Dakota Transportation Commission rectified an earlier discrepancy regarding the speed limit in this area. See SDR

Trooper Bader observed an east-bound vehicle which appeared to be traveling above the posted 65 mph speed limit.  Id.  The vehicle was determined to be traveling 69 mph by the trooper's radar system.  Id.  Defendant Victor Sesay,[6] the driver of the subject vehicle, testified he was using a GPS device which indicated he was not exceeding the posted speed limit.  Id. at pp. 2-3.  He testified there were other vehicles in the vicinity traveling faster than his vehicle.  Id. at p. 3.  Trooper Bader stated that while there were other vehicles traveling ahead of Mr. Sesay's vehicle, the officer was confident the radar system captured the speed of the defendant's vehicle.  Id.

According to the South Dakota Highway Patrol log, a dispatcher conducted a query of the vehicle's license plate number through the National Crime Information Center ("NCIC") database at 12:14 p.m.[7]  Id.  A query was also made through the South Dakota and Colorado Departments of Motor Vehicles. (Exhibit 2 at p. 1).  Colorado reported the 2015 Jeep as a rental vehicle owned by Hertz Vehicles LLC.  Id. at p. 2.  Trooper Bader initiated a traffic stop of the vehicle at about mile marker 69.

---

70:01:02:00(1) (as amended) (on "Interstate 90 beginning at milepost 52.02 and ending at milepost 67.8 . . . [the maximum speed limit is] 65 miles per hour.").

[6]Mr. Sesay is a citizen of Sierra Leone and a legal resident of the United States.  (Docket 167 at p. 30:20-31:3).  Mr. Sesay reads and writes in English, the first language of Sierra Leone.  Id. at p. 31:4-16.  He was 36 years old and held a college degree in business and construction.  Id. at p. 64:20-24.

[7]Exhibit 2 reflects the time as 13:14:44, which was for the Central Time Zone.  All times will be identified as Mountain Time Zone times.  See also Docket 125 at p. 3.  For continuity, all testimony will be indicated in 12-hour clock time as opposed to a 24-hour clock or military time.

Based on Trooper Bader's observations, the only justification for the stop of the vehicle was the speeding violation. The magistrate judge found "that Trooper Bader had probable cause to stop the vehicle . . . ." (Docket 125 at p. 10). "[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." United States v. Adler, 590 F.3d 581, 583 (8th Cir. 2009) (citing Whren v. United States, 517 U.S. 806, 810 (1996)). "Any traffic violation, however minor, provides probable cause for a traffic stop." Id. (internal citations omitted).

Even if the Jeep was not the speeding vehicle, the magistrate judge found in the alternative that "Trooper Bader . . . had an objectively reasonable mistaken factual belief that the [Jeep] was traveling above the speed limit." (Docket 125 at p. 10). As long as an officer's "mistake . . . was an objectively reasonable one," the stop is "supported by probable cause." United States v. Payne, 534 F.3d 948, 951 (8th Cir. 2008) (internal citation omitted).

The magistrate judge's conclusions on the issue of probable cause for the initial stop are supported by the evidence. The government's first objection to the report and recommendation (Docket 156 ¶ 1) is overruled.

DETENTION

A traffic stop may not last longer than "is necessary to effectuate" the purpose of the stop. Rodriguez v. United States, 135 S. Ct. 1609, 1614 (2015). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." Id. "An officer, in other

6

words, may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." Id. at 1615. A traffic stop may be extended if there is an objectively reasonable suspicion of criminal activities to justify detaining an individual beyond the original purpose of the stop. Id.; see also United States v. Ward, 484 F.3d 1059, 1062 (8th Cir. 2007) (other citations omitted). To extend a stop, a " 'police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts reasonably warrant' further investigation." United States v. Woods, 829 F.3d 675, 679 (8th Cir. 2016) (citing Terry v. Ohio, 392 U.S. 1, 21 (1968)). "A constitutionally permissible traffic stop can become unlawful, however, 'if it is prolonged beyond the time reasonably required to complete' its purpose." United States v. Peralez, 526 F.3d 1115, 1119 (8th Cir. 2008) (citing Illinois v. Caballes, 543 U.S. 405, 407 (2005)).

The traffic stop occurred at 12:18 p.m.[8] (Docket 125 at p. 3; see also Exhibit B). Trooper Bader approached the vehicle on the passenger side. (Docket 149 at p. 54:21-22). In the rear-cargo area of the Jeep he observed "nicer, high-end luggage" and "newer . . . gift bags, which kind of indicated there had been some stuff recently purchased." Id. at p. 55:9-13. He observed three

---

[8]The patrol car video recording of the stop and subsequent activities "was either improperly categorized or not tagged and was deleted after a certain number of days as part of a routine system of data management." (Docket 125 at p. 20).

7

black men inside the vehicle "wearing nicer clothing, jewelry accessories, if you will, as far as high-end watches and stuff like that as far as the clothing goes." Id. at p. 55:13-17. Trooper Bader testified that in the center console area were "what appeared to be an unusual amount of gift cards or prepaid debit-type cards." (Docket 149 at p. 55:20-22). He estimated there were "probably more than five, less than ten or 12, somewhere roughly around that [number]." Id. at pp. 55:25-56:1. He knew "it was enough to kind of make me look at it and take note of it." Id. at p. 55:24-25.

Trooper Bader testified the three men "appeared to be . . . nervous, kind of uneasy with [his] presence" but he acknowledged this was common "[f]or the initial traffic stop." Id. at p. 56:4-8. In response to the trooper's request, Victor Sesay handed him a driver's license and the front passenger, Tapsiru Dainkeh,[9] handed him the rental contract for the Jeep. Id. at p. 57:1-2 and 14-19.

Mr. Sesay was asked to come back to the trooper's patrol car. Id. at p. 57:23-25. He followed Trooper Bader back to the patrol car where Mr. Sesay sat in the front passenger seat. Id. at p. 58:1-4. According to Trooper Bader, Mr. Sesay "appeared overly nervous. He was seen rubbing his hands on the top of his legs several times, as if he was trying to get the sweat off his hands. He seemed uncomfortable, however, he was friendly while in my patrol car." Id. at p. 58:6-10. Trooper Bader acknowledged it is typical during any stop to "see

---

[9]Mr. Dainkeh was 32 years old and had three years of college. Id. at p. 78:5-11.

8

some nervousness," but Mr. Sesay's nervousness "actually increased throughout the traffic stop." Id. at p. 58:14-17.

Trooper Bader ran a "driver's license query" through his patrol car computer. Id. at pp. 59:10 and 60:15-16. The query was initiated and the return information was received by Trooper Bader in about one minute, at 12:23 p.m. (Docket 125 at p. 5; see also Exhibit 3). The report disclosed that Mr. Sesay had a valid Maryland driver's license. (Exhibit 3).

Trooper Bader informed Mr. Sesay he would be receiving a warning ticket for speeding and for following too closely to another vehicle. (Docket 149 at p. 157:13-18). The warning ticket process was "opened" at 12:28 p.m. by Trooper Bader.[10] Id. at p. 158:9-16. While waiting for the warning ticket process to be completed Trooper Bader engaged Mr. Sesay in conversation just to pass the time and "try to help their outlook on law enforcement." Id. at p. 61:10-14. Mr. Sesay indicated they were coming from Wyoming and were heading back to Colorado. Id. at p. 61:22-23. When told they were "off route," Mr. Sesay stated his "GPS told me to . . . make . . . a U-turn at the next exit, so that's where I am headed east. I am supposed to make a U-turn and head west." (Docket 167 at p. 38:17-19). Mr. Sesay indicated they were heading to Denver to attend a wedding. (Docket 149 at p. 62:11-14). When asked about the wedding, Trooper Bader testified Mr. Sesay's responses "were very vague. . . .

---

[10]The warning ticket was not offered as an exhibit at the suppression hearing. (Docket 125 at p. 5 n.4).

9

There was just a very, very generic story and time line." Id. at p. 62:21-63:1. But Trooper Bader did not "remember probing him really for details of [the wedding]." Id. at p. 63:18.

During this conversation, Trooper Bader observed Mr. Sesay's "general nervousness, the heavy breathing, the wiping of the hands and the continued looking at the cell phone, trying to come up with answers for different simple questions." Id. at p. 63:7-12. Based on his training and experience, Trooper Bader felt Mr. Sesay was "lying about the trip and that raises my suspicion of criminal activity." (Docket 149 at p. 63:2-6).

According to the log of the Pennington County Dispatch Center, South Dakota Highway Patrol Trooper Robert Rybak reported he was en route to Trooper Bader's location at 12:49:43. (Exhibit B at p. 2). The log is unclear whether Trooper Bader called for back-up assistance or if Trooper Rybak was listening to radio traffic and simply indicated he would go to Trooper Bader's location and assist with the traffic stop. Trooper Rybak arrived at the scene of the stop at approximately 1:02 p.m.[11] (Docket 149 at pp. 169:24-170:1).

Special Agent Nick Saroff of the Department of Homeland Security, Homeland Security Investigations, testified he received a call from Trooper Bader

---

[11]Trooper Rybak's patrol car video recording was erased as the incident was logged as only a traffic stop and not a criminal investigation or the camera was never turned on. (Dockets 149 at pp. 123:24-26:25 and 167 at p. 85:21-25).

10

at "around 12:50," who described "what he had, roadside." (Docket 149 at p. 218:11-13). When Special Agent Saroff arrived on scene at 1:15 p.m. Trooper Rybak was already there. Id. at p. 218:25-219:19.

The magistrate judge found that "21 minutes elapsed between when Trooper Bader decided to issue a warning ticket and when he called for backup, presumably to assist with the search." (Docket 125 at p. 7). The record supports this finding. The government's objection to this finding (Docket 156 ¶ 2) is overruled.

Trooper Bader testified he asked Mr. Sesay for consent to search the Jeep and his items in the vehicle. (Docket 149 at p. 66:19-21). According to Trooper Bader, Mr. Sesay "did not have any objections to that." Id. at p. 66:22. Mr. Sesay denies giving Trooper Bader consent to search either the Jeep or his personal belongings. (Docket 167 at p. 70:13-16).

After speaking with Mr. Sesay, Trooper Bader testified he went back to the Jeep and "engaged [Mr. Conteh and Mr. Dainkeh] in general conversation." (Docket 149 at p. 68:7-8). When Trooper Bader indicated the vehicle rental agreement had expired, Mr. Dainkeh said it had been renewed. Id. at p. 68:9-11. Trooper Bader understood that to mean they had called in and extended the contract. Id. at p. 68:10-12.

Trooper Bader thought Mr. Conteh and Mr. Dainkeh appeared nervous. "They appeared to be uncomfortable with me talking to them about the trip, and the details about the trip and stuff was inconsistent with the driver's story." Id.

11

at p. 68:17-20. "[T]hey advised me that they were coming from Wyoming, where they tried to meet up with a friend, and then . . . they were in Rapid City attempting to meet up with another friend that didn't show up, and now they were heading to Sioux Falls to go pick some stuff up. . . . [They] mentioned nothing about a wedding at all." Id. at p. 70:1-11. It was at this point that Trooper Bader says he asked them "for consent to search the car, and both . . . stated that they were okay with me searching the car." Id. at p. 73:5-7. He also "asked for consent to search their person . . . [and] they both stated that was fine . . . ." Id. at p. 73:8-11. Trooper Bader testified he asked the two men to step out of the Jeep, he conducted a pat-down search of them and asked them "to stand down in the ditch while [he] conducted a search of the vehicle." Id. at p. 73:7-8 and 20-21.

Trooper Bader testified that after visiting with Mr. Conteh and Mr. Dainkeh he went back to his patrol car and made contact with Mr. Sesay "to explain to him what was going on and to once again confirm that he was okay with me searching his property, as well." (Docket 149 p. 73:22-25). According to Trooper Bader, Mr. Sesay "was surprised that they would allow me to search the car . . . ." Id. at p. 74:4-5. His report noted Mr. Sesay "acted very confused as to why [Mr. Conteh and Mr. Dainkeh] would allow me to search the vehicle."[12] Id. at p. 120:20-25. But according to Trooper Bader, Mr. Sesay indicated "he

---

[12]Trooper Bader's investigative report was not offered as an exhibit at the suppression hearing.

12

was okay with me searching his property as long as they were okay with me searching the car." Id. at p. 74:9-10. This conversation occurred about 45 minutes after the stop. Id. at p. 121:12-17.

In his report, Trooper Bader did not mention he received Mr. Sesay's consent to search when they were first together in the patrol car. (Docket 149 at p. 162:18-23). Rather, after apparently receiving consent to search from Mr. Dainkeh and Mr. Conteh, the report indicates Trooper Bader sought consent from Mr. Sesay. Id. at p. 163:1-6. The court agrees with the magistrate judge's conclusion that it is illogical Mr. Sesay would be upset his partners gave consent to search the vehicle, if Mr. Sesay had already consented. (Docket 126 at p. 8 n.7).

Mr. Dainkeh denies he gave consent to search the Jeep or his personal belongings.[13] (Docket 167 at pp. 75:23-76:10). According to Mr. Sesay, after leaving the patrol car Trooper Bader demanded that Mr. Conteh and Mr. Dainkeh "[g]et up. I said get out of the car. I need to search the car. Get out of the car." Id. at p. 40:8-10. Mr. Sesay testified that when the second officer arrived, Trooper Bader admitted not having consent to search the vehicle and the second officer directed Trooper Bader to put everything "back in the car . . . and let them go." Id. at p. 41:3-11. Trooper Bader never told Trooper Rybak the three men had given consent to search the vehicle. See id. at pp. 80:17-97:18. Trooper

---

[13]Mr. Conteh did not testify at the suppression hearing.

13

Rybak never contradicted Mr. Sesay's testimony.  See id.  As Special Agent Saroff arrived he observed two of the occupants of the Jeep were out of the vehicle, "sitting on the edge of the asphalt and the grass."  (Docket 149 at pp. 219:21-22 and 238:12-15).  Trooper Bader told Special Agent Saroff that he had consent from the three men to search.  (Docket 167 at p. 17:5-8).

Trooper Bader started a search of the vehicle by himself.[14]  (Docket 149 at p. 74:9-10).  Photographs were taken during the course of the search.  See Exhibits 8-29.  Trooper Bader acknowledged items in the vehicle were moved before the photographs were taken.  (Docket 149 at p. 85:14-16).  He testified that "once I became suspicious of criminal activity and knew that we were going down the road of where we wanted to preserve some evidence and stuff, I went back and tried to take some photos to give a good note of where items were located."  Id. at p. 131:21-25.

This testimony contradicts the trooper's earlier belief that criminal activity was occurring: "based off of the nervousness, the inconsistent stories, the time line, the overdue rental, the driver of the vehicle not being on the rental contract, the recently purchased items, the inconsistent items, as far as the story goes between the driver and the passengers, you know, there was just a bunch of indicators to criminal activity."  (Docket 149 at p. 127:15-21).  Trooper Bader

---

[14]When Trooper Rybak arrived Trooper Bader was already actively involved in the search of the vehicle.  (Docket 167 at pp. 87:5-88:6).

14

also testified earlier that when he talked to Mr. Conteh and Mr. Dainkeh he "confirmed [his] suspicions of criminal activity . . . ." Id. at pp. 72:24-73:1.

The magistrate judge noted as part of the credibility analysis that despite his testimony regarding the importance of observing a number of prepaid cards in the console area and those cards being part of his suspicion that criminal conduct was afoot, "Trooper Bader failed to note these cards in his report or take a picture of where he allegedly saw them." (Docket 125 at p. 4 n.2; see also Docket 149 at p. 153:21-25). If Trooper Bader was suspicious of criminal activity as the result of his initial observations and conversations with the three men, he would have taken photographs before moving items in the car. His failure to do so was a tacit acknowledgement he did not have a reasonably held suspicion of criminal activity before he commenced the search. Woods, 829 F.3d at 679.

The court finds Trooper Bader's testimony that the three men were "wearing nicer clothing, jewelry accessories . . . [and] high-end watches and stuff like that as far as the clothing goes"[15] is not supported by the photographs of the men. (Exhibits 27-29). Their appearance, dress and jewelry are not out-of-the-ordinary and provide no basis for raising the suspicion of an objectively reasonable person that criminal conduct may be occurring. Rodriguez, 135 S. Ct. at 1615. By the same standard, nothing in the rear cargo area of the Jeep

---

[15]Docket 149 at p. 55:13-17.

indicates "nicer high-end luggage" or "newer . . . gift bags" as testified to by Trooper Bader.[16]  See Exhibits 10-11, 13 & 20.

Trooper Bader's testimony that all three men were extremely nervous and evasive is contradicted by his later testimony.  He described the men as "consistently friendly, nice, respectful.  We kind of joked around and laughed several times throughout the traffic stop.  That attitude, that mentality was consistent throughout the traffic stop."  (Docket 149 at p. 198:12-15).  Trooper Bader was asked if Mr. Sesay's photograph was indicative of their demeanor, that is, that they were "smiling and happy."  Id. at p. 198:16-17 (referencing Exhibit 26).  "Absolutely," was Trooper Bader's response.  Id. at p. 198:18.  While they do not appear as relaxed as Mr. Sesay, the photographs of Mr. Conteh and Mr. Dainkeh do not show any evidence of extreme nervousness or other signs of evasive behavior.  See Exhibits 28 & 29.

The magistrate judge found Trooper Bader's suspicions of high end clothing, cards in the center console, inconsistent answers about their itinerary, direction of travel and nervousness "do not amount to reasonable suspicion."  (Docket 125 at p. 14).  The magistrate judge found Trooper Bader's testimony "contradictory and therefore, not fully credible."  Id.  The magistrate judge found Mr. Sesay credible on the consent issue.  (Docket 125 at p. 8 n.7).

"A credibility finding made by a magistrate judge after a hearing on the merits of a motion to suppress is virtually unassailable . . . ."  United States v.

---

[16]Docket 149 at p. 55:9-13.

Shafer, 608 F.3d 1056, 1065 (8th Cir. 2010) (internal quotation omitted). The magistrate judge resolved the contested issues by finding Trooper Bader's testimony was not totally credible and Mr. Sesay's testimony was credible.[17] It is clear in the record "[t]he magistrate judge made the credibility determinations by considering (1) the demeanor of the witnesses on the stand, (2) the interests the witnesses had in the outcome of the motion, and (3) the opportunity of the witnesses to hear, observe, and recall what was said or done." United States v. Anderson, 688 F.3d 339, 345 (8th Cir. 2012). The court finds "there is substantial evidence in the record to support" the magistrate judge's credibility determinations. Id. at 346.

"The reasonable articulable suspicion standard is a fact-specific inquiry based on the totality of the circumstances in a particular case." United States v. Riley, 684 F.3d 758, 764 (8th Cir. 2012). "[R]easonable suspicion [is] 'a particularized and objective basis' for suspecting criminal activity." United States v. Linkous, 285 F.3d 716, 720 (8th Cir. 2002) (citing Ornelas v. United States, 517 U.S. 690, 699 (1996) (internal citation omitted). Objectively applying that standard to the "totality of the circumstances" in this case, the

---

[17]The magistrate judge found Mr. Sesay not credible in an unrelated area. "Mr. Sesay testified that Trooper Bader handcuffed him, but the court does not find Mr. Sesay's testimony on this fact credible. There is a lack of independent evidence showing that Trooper Bader handcuffed Mr. Sesay. Plus, there is no allegation that Trooper Bader handcuffed either of the other two Defendants. It would have been a curious decision for Trooper Bader to handcuff Mr. Sesay but not Mr. Dainkeh or Mr. Conteh." (Docket 125 at pp. 25-26). The defendants did not challenge this finding.

court finds Trooper Bader did not possess "a reasonably, articulable suspicion that [these individuals were] engaged in unlawful activity" before the vehicle search commenced. Riley, 684 F.3d at 764.

The court finds the report and recommendation appropriately applied the law to the facts presented at the suppression hearing. The government's objections (Docket 156 ¶¶ 5-10) are overruled.

EXPANSION OF THE PURPOSE FOR THE STOP

When asked if he could "write a warning ticket in 35 to 40 minutes," Trooper Bader responded that it "depends on the technology . . . information will auto-populate into the system and sometimes it takes an hour and a half waiting on the computer program to work." (Docket 149 at p. 166:12-18). Earlier in the hearing Trooper Bader testified "sometimes it depends on if our computer systems are working properly, it will take a minute or so sometimes to get this information back. All of this information, once it's ran, is supposed to auto-populate into a program that we would do a citation or a warning [ticket] on. So once that information is input into that form, we will fill out that information . . . ." Id. at p. 61:5-11. Trooper Bader did not testify how long after he started the warning ticket process he received the information necessary so the warning ticket could have been issued. Trooper Bader estimates he gave Mr. Sesay the warning ticket at about 3 p.m. Id. at p. 112:17-23. Mr. Sesay testified neither Trooper Bader nor Special Agent Saroff gave him a warning ticket that afternoon. (Docket 167 at p. 72:13-20).

18

The record is not clear how much time elapsed before the computer program provided Trooper Bader with sufficient information to process a warning ticket and hand it to Mr. Sesay. It is clear from the record Trooper Bader changed his focus from issuing a warning ticket to searching the defendants' vehicle over the next couple of hours. The government failed to carry its burden of showing the stop was not prolonged by Trooper Bader's activities not routinely required to complete the purpose of the stop, that is, issuance of a warning ticket. United States v. Riedesel, 987 F.2d 1383, 1388 (8th Cir. 1993) ("When the government seeks to introduce evidence that was seized during a warrantless search, it bears the burden of showing the need for an exemption from the warrant requirement and that its conduct fell within the bounds of the exception.").

Trooper Bader's decision to expand the purpose of the traffic stop beyond that of issuing a warning ticket constituted an "unreasonable seizure" and was constitutionally prohibited. Rodriguez, 135 S. Ct. at 1612; Peralez, 526 F.3d at 1121. The traffic stop was unlawfully prolonged and the search of the Jeep was unlawful. Because "the constitutional violation was 'at least a but-for cause of obtaining the evidence' . . . suppression of [the] evidence [is] the appropriate remedy." Peralez, 526 F.3d at 1121 (citing United States v. Olivera–Mendez, 484 F.3d 505, 511 (8th Cir. 2007) (other internal citations omitted).

The court finds the report and recommendation properly applied the law to the facts presented in this case. The government's objections (Docket 156 ¶¶ 3-4 and 11-13) are overruled.

The report further recommended that because the defendants were not in custody, any statements made by them during the course of the traffic stop are not suppressed. (Docket 125 at pp. 24-26). Defendants did not object to this recommendation.

**ORDER**

Based on the above analysis, it is

ORDERED that the government's objections (Docket 156) are overruled.

IT IS FURTHER ORDERED that the report and recommendation (Docket 125) is adopted by the court.

IT IS FURTHER ORDERED that the defendants' motions to suppress (Dockets 97, 103 & 105) are granted in part and denied in part.

IT IS FURTHER ORDERED that all physical evidence seized during the traffic stop is suppressed.

IT IS FURTHER ORDERED that statements made by the defendants during the course of the traffic stop are admissible at trial in the government's case-in-chief.

Dated June 26, 2017.

BY THE COURT:

/s/ *Jeffrey L. Viken*
JEFFREY L. VIKEN
CHIEF JUDGE