UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>   vs.<br><br>ROY CONTEH,<br>VICTOR SASAY, a/k/a VICTOR SESAY<br>and TAPSIRU DAINKEH,<br><br>                Defendants. | CR. 15-50101-JLV<br><br>ORDER |

**INTRODUCTION**

      Defendant Roy Conteh filed a second motion *in limine*. (Docket 257). Defendants Victor Sasay and Tapsiru Dainkeh joined in the motion.[1] (Dockets 258 & 259). Mr. Sasay also filed a motion *in limine* regarding Fusion Center attempts to identify the defendants ("Fusion Center motion"). (Docket 260). Mr. Conteh and Mr. Dainkeh joined in the motion.[2] (Dockets 261 & 262).

      Pursuant to Wong Sun v. United States, 371 U.S. 471 (1963), and subsequent court decisions, the defendants seek exclusion of all the evidence and information obtained as the result of a traffic stop on July 10, 2015. (Docket 257 at p. 3). The government opposes both motions. (Docket 263). On February 14, 2018, the court held a hearing on defendants' Wong Sun

---

      [1]For purposes of this order the court will reference only the motion of Mr. Conteh as the defendants' motion.

      [2]For purposes of this order the court will reference only the motion of Mr. Sasay as the defendants' motion.

challenges to permit the parties to present evidence and testimony on defendants' motions. For the reasons stated below, defendants' second motion *in limine* is granted in part and denied in part and the Fusion Center motion is denied.

**ANALYSIS**

A grand jury issued an indictment charging defendants with ten counts of aggravated identity theft in violation of 18 U.S.C. §§ 1028A(a)(1) and 2, and one count of possession of an unauthorized access device in violation of 18 U.S.C. §§ 1029(a)(3) and 2. (Docket 1). Defendants filed separate motions to suppress physical evidence seized during the course of a traffic stop and any custodial statements made by the defendants during the stop. (Dockets 97, 103 & 105).

The motions to suppress were referred to United States Magistrate Judge Daneta Wollmann pursuant to 28 U.S.C. § 636(b)(1)(B) and a standing order of the court. An evidentiary hearing was conducted by the magistrate judge. Before a ruling by the court, a grand jury returned a superseding indictment charging the defendants with one count of conspiracy to commit bank fraud in violation of 18 U.S.C. §§ 1344 and 1349; twelve counts of bank fraud in violation of 18 U.S.C. §§ 2 and 1344(2); ten counts of aggravated identity theft in violation of 18 U.S.C. §§ 2 and 1028A(a)(1); and nine counts of possession of an unauthorized access device in violation of 18 U.S.C. §§ 2 and 1029(a)(1). (Docket 111).

The magistrate judge issued a report and recommendation ("R&R") on defendants' motions to suppress.  (Docket 125).  The magistrate judge recommended defendants' motions to suppress be granted in part and denied in part.  Id. at p. 26.  The government timely filed objections to the report and recommendation.  (Docket 156).  The defendants filed responses to the government's objections.  (Dockets 162, 164 & 169).  Following a *de novo* review of those portions of the R&R to which objections were filed, the court entered an order overruling the government's objections and adopting the R&R.  (Docket 196 at p. 20).  The order granted in part and denied in part defendants' motions to suppress.  Id.  As the result of the order, "all physical evidence seized during the [July 10, 2015] traffic stop is suppressed. . . . [and] statements made by the defendants during the course of the traffic stop are admissible at trial in the government's case-in-chief."[3]  Id.

During the course of a pretrial conference "the court concluded it was necessary to conduct additional pretrial proceedings and to move the date for the jury trial in order to secure defendants a fair trial under the United States Constitution."  (Docket 256 at p. 1).  The court directed the government to "disclose to the defendants the government's witness list and list of exhibits for use at trial" and required the defendants to "file motions *in limine* setting forth the legal basis under Wong Sun v. United States, 371 U.S. 471 (1963), and

---

[3]The R&R "recommended that because the defendants were not in custody, any statements made by them during the course of the traffic stop are not suppressed.  Defendants did not object to this recommendation."  (Docket 196 at p. 20) (referencing Docket 125 at pp. 24-26).

3

subsequent decisions of the United States Supreme Court and the United States Court of Appeals for the Eighth Circuit, for challenging the admissibility of the government's proposed exhibits and witnesses in light of the order of June 26, 2017." Id. at pp. 1-2 (referencing Docket 196). Defendants filed their second motion *in limine* and the Fusion Center motion. (Dockets 257 & 260). The government opposed both motions. (Docket 263).

At the hearing to consider defendants' Wong Sun challenges, the government offered testimony from Zac Bader, South Dakota Highway Patrol Trooper, and Nicholas Saroff, Special Agent from Homeland Security Investigations, Department of Homeland Security. The court admitted Hearing Exhibits 1-11.

Trooper Bader testified that shortly after noon on July 10, 2015, he stopped a Jeep SUV for speeding and following another vehicle too closely. He approached the vehicle where the driver handed Trooper Bader a driver's license and the front seat passenger handed him a Hertz Rental Agreement. The driver's license identified the operator of the vehicle as Victor Sasay. The rental agreement indicated the vehicle was rented in the name of Tapsirruu Dainkeh [sic], the front passenger. Trooper Bader learned the name of the rear seat passenger, Roy Conteh, through a photo identification card. Trooper Bader testified that within approximately fifteen minutes of the stop he called SA Saroff to give him the names and dates of birth of the three men. Trooper Bader recalls he contacted SA Saroff for an updated immigration status of all three men.

4

Trooper Bader testified that within 45 minutes SA Saroff arrived at the scene of the traffic stop. Later a warning ticket for speeding and following too closely was issued to Mr. Sasay and the three men were allowed to drive away.

Trooper Bader stated the next day, Saturday, July 11, 2015, he received through his law enforcement e-mail account a Fusion Report, a be-on-the-lookout notice ("BOLO"), distributed by the South Dakota Office of Homeland Security Fusion Center dated July 10, 2015, ("July 10 Fusion Report"). Hearing Exhibit 2 at p. 2. The trooper testified that as a South Dakota Highway Patrol Officer he receives Fusion Reports or BOLOs nearly every day on topics ranging from be-on-the-lookout for a person-of-interest in murder or assault investigations, car or other property theft investigations, identity theft investigations and a wide range of other law enforcement concerns. Trooper Bader testified he did not solicit the July 10 Fusion Report and he had not spoken with Police Officer Samantha Rosenau of Spearfish, South Dakota, before reviewing the report. He stated it was "pure coincidence" he received the July 10 Fusion Report the day after his traffic stop.

The July 10 Fusion Report asked members of the law enforcement community to assist the Spearfish Police Department in identifying "two African Americans" from the Casper, Wyoming, area who on July 9, 2015, were at the Sturgis, South Dakota, Shopko around 10 a.m. and the Spearfish Safeway and Walgreens at about 4:50 p.m. Exhibit 2 at p. 2. The two men were "purchasing

Visa . . . gift cards with . . . stolen credit cards. . . . in very large amounts." The report indicated the investigation included information the two men had been in Casper, then Ft. Collins, Colorado, before coming to Spearfish.  Id.  The July 10 Fusion Report asked any "[o]fficer[] with any information on these subjects . . . to contact Samantha Rosenau of the Spearfish Police Dept . . . ." and included a contact telephone number.  Id.

Upon examining the July 10 Fusion Report, Trooper Bader concluded the photographs of the men were two of the individuals he had encountered during the traffic stop the day before.  Trooper Bader called Officer Rosenau on July 11 and gave her the names and dates of birth for Mr. Sasay and Mr. Dainkeh.

On July 13, Trooper Bader called Officer Rosenau a second time and she gave him contact information for the Casper, Wyoming, law enforcement agency which had issued a BOLO containing similar information.  He called Casper and gave an officer the names and dates of birth for Mr. Conteh, Mr. Sasay and Mr. Dainkeh which Trooper Bader obtained during the July 10 traffic stop.

SA Saroff testified that on July 10, 2015, he received a call from Trooper Bader within minutes of the trooper's stop of a vehicle for speeding.  Trooper Bader gave him the names and dates of birth for the vehicle's occupants.  Before traveling to the scene of the traffic stop, SA Saroff asked Enforcement Removal Operations Special Agent Howie to do an information search on the three men. Saroff then traveled to Trooper Bader's location where he saw three men who were occupants of the stopped vehicle.  SA Saroff believes he arrived at the

6

scene about 1:15 p.m.  Shortly after his arrival, SA Saroff received an e-mail from SA Howie.  The e-mail contained the driver's license information and color photographs of Mr. Conteh and Mr. Sasay.  Hearing Exhibits 10 and 11.  From the photographs, SA Saroff was able to confirm the men at the traffic stop were Mr. Conteh and Mr. Sasay.

On Saturday July 11, SA Saroff received a telephone call from Trooper Bader who explained what he learned from the July 10 Fusion Report.  On July 13, SA Saroff expanded his investigation based on the July 10 Fusion Report.  He contacted Wyoming authorities who sent him an e-mail containing a BOLO for credit card fraud in the state of Wyoming.  Hearing Exhibit 1.

The Wyoming BOLO was dated July 13, 2015 ("July 13 Wyoming BOLO"). Id. at p. 3.  This report contained photographs of three men and their vehicle. Id.  The vehicle was described as a "Blue 2015 Jeep Cherokee, bearing Colorado plate: 595VQU," a "rental out of Denver, Colorado."  Id.  The report included "Dankseh, Tapsirruu [sic]," of "Richardson, TX," with a date of birth as the driver. Id.  The remainder of the July 13 Wyoming BOLO contained information about alleged criminal conduct similar to that described in the July 10 Fusion Report. Compare Hearing Exhibit 1 and 2.  The report indicated "[i]ncidents have occurred in Casper, Douglas, and Wheatland, Wyoming."  Hearing Exhibit 1 at p. 3.  Law enforcement agencies with information were asked to "contact Officer Greg Hachtel at the Douglas Police Department" and gave a telephone number and e-mail address to contact Officer Hachtel.  Id.

Also on July 13, SA Saroff learned two of the suspects had been arrested in Virginia on March 14, 2015. He obtained copies of the fingerprint cards and photographs of Mr. Sasay and Mr. Dainkeh. Hearing Exhibits 8 and 9.

On July 14, 2015, SA Saroff made contact with Officer Warren Poches of the Rapid City Police Department. Officer Poches was investigating a report of multiple fraudulent credit card activities involving customers of Dacotah Bank and Black Hills Federal Credit Union in Rapid City. Officer Poches e-mailed SA Saroff a color copy of the July 10 Fusion Report. Hearing Exhibit 2.

SA Saroff testified he starting working backward to determine when and where the three suspects might have been engaged in fraudulent credit card activities. He obtained video recordings of the activities in Spearfish and Officer Rosenau's narrative of her investigation. Included in that information was Officer Rosenau's e-mail and seven pages of still photographs taken from the Spearfish businesses' security cameras which she sent to the South Dakota Fusion Center on July 10, 2015, at 2:06 p.m. Hearing Exhibit 6. This packet of information was delivered to the Fusion Center during the same time frame as Trooper Bader conducted his traffic stop with the three defendants. Id. at p. 1.

During his nationwide information search during the week of July 14, 2015, SA Saroff learned Mr. Sasay and other individuals had been arrested in San Marco, Texas, in April, 2015, for fraudulent credit card activities. SA Saroff learned Mr. Conteh was present and one of the vehicles seized during the arrest

8

had been rented to him. The information also reported the second vehicle seized had been rented by Mr. Sasay's female cousin.

SA Saroff contacted his counterpart in Casper, Wyoming, Homeland Security Special Agent John Allred. SA Allred was lead investigator for the fraudulent credit card activities in Wyoming, Colorado and Nebraska. SA Saroff gave SA Allred the names and dates of birth for Mr. Conteh, Mr. Sasay and Mr. Dainkeh.

On August 21, 2015, Officer James Hasskamp with the Wyoming Criminal Intelligence Center in Cheyenne, Wyoming, e-mailed Special Agents Saroff and Allred a BOLO dated August 20, 2015, from Vernal City, Utah ("August 20 Utah BOLO"). Hearing Exhibit 3. The August 20 Utah BOLO contained five color photographs of three men and a white sedan. Id. at p. 2. SA Saroff recognized the men in the report as the men who had been stopped by Trooper Bader on July 10, 2015. These same men were visible in the security camera videos SA Saroff obtained from the various businesses victimized by fraudulent transactions.

During his investigation, SA Allred had been in contact with Officer Matt Watson of the Plattsmouth, Nebraska, Police Department. On July 30, 2015, Officer Watson e-mailed SA Allred three identification cards containing photographs, addresses and dates of birth for Mr. Dainkeh and Mr. Conteh. Hearing Exhibit 4 at pp. 3-4. Officer Watson also provided to SA Allred a 13-page report containing information regarding fraudulent credit card activities

9

in Plattsmouth on July 12, 2015.  Hearing Exhibit 7.  Within this packet, Officer Watson wrote:

> I received three photographs from the traffic stop in South Dakota that individually depicted three black males holding an identification.  The photograph . . . of the black male with glasses on and holding an identification from Sierra Leone and issued to Tapsiru Dainkem [sic] (DOB: **-**-1984) is one of the two suspects that used stolen credit cards at the Plattsmouth Nebraska Shopko on July 12, 2015.  The photograph . . . of the black male seated in a vehicle and holding an identification from the state of Maryland and issued to Victor Sasay (DOB:**-**-1979) is the second suspect that used stolen credit cards at the Plattsmouth . . . Shopko on July 12, 2015.

Id. at p. 4.  Officer Watson faxed copies of the Plattsmouth investigative reports to Officer Hachtel of the Douglas, Wyoming, Police Department.  Id.  The remainder of Officer Watson's report details his investigative activities and his contacts with SA Allred through August 14, 2015.  Id. at p. 5.  Attached to Officer Watson's report were eight receipts from the Plattsmouth Shopko which resulted from allegedly fraudulent credit card activities.  Id. at pp. 8-11.  According to SA Saroff the information, Hearing Exhibits 4 and 7, was e-mailed to him in late August or early September and was sent by Federal Express to his office.

During the course of the investigation, SA Saroff learned that a law enforcement officer in Wheatland, Wyoming, reviewed a security camera video taken at the Maverick gas station.  According to SA Saroff, before the July 10, 2015, South Dakota traffic stop the Wheatland police officer researched the license plate on the suspect vehicle and learned the vehicle was a rental.

Evidence which is the "fruit" of an illegal search or seizure is not admissible and "[t]he exclusionary prohibition extends as well to the indirect as the direct products of such invasions." Wong Sun, 371 U.S. at 484-85. The controlling question is "whether, granting establishment of the primary illegality, the evidence to which the instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Id. at 488 (internal quotation marks and citation omitted). "[W]hen . . . the evidence in question would inevitably have been discovered without reference to the police error or misconduct, there is no nexus sufficient to provide a taint and the evidence is admissible." Nix v. Williams, 467 U.S. 431, 448 (1984). Evidence obtained as a result of a constitutional violation may still be admissible if the later discovery is significantly attenuated from the primary violation, that is, if the later discovery was inevitable. Nix, 467 U.S. at 446.

"The independent source doctrine allows admission of evidence that has been discovered by means wholly independent of any constitutional violation." Nix, 467 U.S. at 466-67. The critical inquiry under the independent source doctrine is whether the challenged evidence was obtained from lawful sources and by lawful means independent of the police misconduct. Segura v. United States, 468 U.S. 796, 805 (1984).

"The inevitable discovery doctrine, with its distinct requirements, is in reality an extrapolation from the independent source doctrine: *Since* the tainted

evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered." Murray v. United States, 487 U.S. 533, 539 (1988) (emphasis in original). The "inevitable discovery of illegally seized evidence must be shown to have been more likely than not." Bourjaily v. United States, 483 U.S. 171, 176 (1987).

"To succeed under the inevitable-discovery exception to the exclusionary rule, the government must prove by a preponderance of the evidence: (1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation." United States v. Conner, 127 F.3d 663, 667 (8th Cir. 1997). In this analysis, "it is important to focus not on what the officers actually did after unlawfully recovering evidence, but on what the officers were reasonably likely to have done had the unlawful recovery not occurred." United States v. Villalba-Alvarado, 345 F.3d 1007, 1020 (8th Cir. 2003).

The June 26, 2017, suppression order found the July 10, 2015, stop of the defendants' vehicle was based on probable cause. (Docket 196 at p. 6). Prior to conducting the stop, Trooper Bader ran a query on the vehicle's license plate and discovered that "Colorado reported the 2015 Jeep as a rental vehicle owned by Hertz Vehicles LLC." Id. at p. 5. As Trooper Bader approached the vehicle, "[i]n response to the trooper's request, Victor Sesay [the driver] handed him a driver's

12

license and the front passenger, Tapsiru Dainkeh, handed him the rental contract for the Jeep." Id. at p. 8. Trooper Bader intended to issue "a warning ticket for speeding and for following too closely to another vehicle." Id. at p. 9.

Through the valid traffic stop, the information obtained for inclusion on the warning ticket issued to Mr. Sasay, as well as the defendants' identities as occupants of the vehicle, and the Hertz rental agreement were legally obtained by Trooper Bader and disclosed to SA Saroff during the ordinary course of their joint investigation. The admissibility of this identification information is not affected by Wong Sun, the independent source doctrine or the inevitable discovery doctrine.

The physical evidence seized during the stop was seized in violation of the defendants' Fourth Amendment rights. The June 26, 2017, order determined:

> Trooper Bader's decision to expand the purpose of the traffic stop beyond that of issuing a warning ticket constituted an "unreasonable seizure" and was constitutionally prohibited. Rodriguez,[4] 135 S. Ct. at 1612; Peralez,[5] 526 F.3d at 1121. The traffic stop was unlawfully prolonged and the search of the Jeep was unlawful. Because "the constitutional violation was 'at least a but-for cause of obtaining the evidence' . . . suppression of [the] evidence [is] the appropriate remedy." Peralez, 526 F.3d at 1121 (citing United States v. Olivera–Mendez, 484 F.3d 505, 511 (8th Cir. 2007) (other internal citations omitted).

(Docket 196 at p. 19).

---

[4]Rodriguez v. United States, ___ U.S. ___, 135 S. Ct. 1609 (2015).

[5]United States v. Peralez, 526 F.3d 1115 (8th Cir. 2008).

For purposes of the Wong Sun hearing only, the court finds the testimony of Trooper Bader and SA Saroff credible. The court finds the government has shown by a preponderance of the evidence that Trooper Bader's discovery of the July 10 Fusion Report was inevitable and independent of the traffic stop, and that the law enforcement agencies' activities discussed above show they were independently and actively pursuing investigations at the time of the July 10, 2015, Fourth Amendment violation. Nix, 467 U.S. at 446; Conner, 127 F.3d at 667.

The court finds the government has shown by a preponderance of the evidence that SA Saroff conducted an independent investigation which discovered information "by means wholly independent of any constitutional violation." Nix, 467 U.S. at 443. The information he received on July 11, 2015, and thereafter from the states of South Dakota, Wyoming, Colorado and Nebraska was obtained from lawful sources and by lawful means independent of the July 10, 2015, police misconduct. Id.; see also Segura, 468 U.S. at 805.

**ORDER**

Based on the above analysis, it is

ORDERED that defendants' motions for joinder (Docket 258, 259, 261 & 262) are granted.

IT IS FURTHER ORDERED that defendants' second motion *in limine* (Docket 257) is granted in part and denied in part consistent with this order.

During the February 21, 2018, pretrial conference the court will determine the admissibility of each of the government's proposed trial exhibits.

IT IS FURTHER ORDERED that defendants' Fusion Center motion (Docket 260) is denied consistent with this order.

Dated February 16, 2018.

BY THE COURT:

/s/ *Jeffrey L. Viken*
JEFFREY L. VIKEN
CHIEF JUDGE